UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS A. PEFLEY,

　　　　　　　Plaintiff,　　　　　　　　CIVIL ACTION NO. 08-15214

　　　　v.　　　　　　　　　　　　　DISTRICT JUDGE PAUL D. BORMAN

COMMISSIONER OF　　　　　　　　MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

　　　　　　　Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

## I.　PROCEDURAL HISTORY

### A.　*Proceedings in this Court*

On December 18, 2008, Plaintiff filed the instant suit seeking judicial review of the

Commissioner's decision disallowing benefits (Dkt. 1).  Pursuant to 28 U.S.C. § 636(b)(1)(B)

and Local Rule 72.1(b)(3), this matter was referred to the undersigned for the purpose of

reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability,

disability insurance and Supplemental Security Income benefits (Dkt. 3).  This matter is currently

before the Court on cross-motions for summary judgment (Dkt. 12, 18).

### B.　*Administrative Proceedings*

Plaintiff filed the instant claims on May 4, 2006, alleging that he became unable to work

on October 1, 2005 (Tr. 135).  The claim was initially disapproved by the Commissioner on

-1-

August 25, 2006 (Tr. 96). Plaintiff requested a hearing and, on June 25, 2008, Plaintiff appeared

with a non-attorney representative before Administrative Law Judge (ALJ) Dean C. Metry, who

considered the case *de novo*. In a decision dated July 18, 2008, the ALJ found that Plaintiff was

not disabled (Tr. 13). Plaintiff requested a review of this decision on July 22, 2008 (Tr. 12). The

ALJ's decision became the final decision of the Commissioner when, after the review of

additional exhibits[1] (AC-1, Tr. 11), the Appeals Council denied Plaintiff's request for review

(Tr. 8); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004).

In light of the entire record in this case, I find that substantial evidence supports the

Commissioner's determination that Plaintiff is not disabled. Accordingly, it is

**RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's

motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be

**AFFIRMED**.

II.    **STATEMENT OF FACTS**

A.    *ALJ Findings*

Plaintiff was forty-seven years of age as of the date he alleged disability, and fifty years

of age as of the date of the ALJ's decision (Tr. 13, 135). Plaintiff's relevant work history

included approximately 14 years as a construction laborer and pipe layer (Tr. 179-186).

---

[1] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since October 1, 2005 (Tr. 24).  At step two, the ALJ found that Plaintiff had the following "severe" impairments: osteoarthritis in both hands; rheumatoid arthritis; bi-polar disorder; and attention deficit disorder (Tr. 18).  At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations (Tr. 19).  Between steps three and four, the ALJ found that Plaintiff had the residual functional capacity (RFC) to "perform light work...except frequent reaching, fingering, handling, stooping, crouching, kneeling, and crawling; no ropes, ladders, scaffolds; simple, repetitive tasks; and occasional public contact" (Tr. 20).  At step four, the ALJ found that Plaintiff could not perform his previous work as a laborer, as this work required "heavy" exertion and was semi-skilled, which exceeded Plaintiff's RFC for no more than "light" work (Tr. 23).  At step five, the ALJ denied Plaintiff benefits, as the ALJ found that Plaintiff could perform a significant number of jobs available in the national economy, such as: inspector/sorter (4,000 jobs in SE Michigan) and cleaner (12,000 jobs in SE Michigan) (Tr. at 23-24).

### B.    *Administrative Record*

#### 1.    **Plaintiff's Testimony and Statements**

Plaintiff testified that hand, neck, and foot pain prevented him from working (Tr. 37).  He stated that arthritis in his hands caused him difficulty closing his fingers to his palms (Tr. 42-43).  Plaintiff also testified he had a great toe "hammertoe" deformity (Tr. 44). Plaintiff further testified he injured three fingers on his left hand on a saw (Tr. 40, 42).  Plaintiff stated that he prepared simple meals for himself (Tr. 193), but said his wife helped him dress (Tr. 192).  He

-3-

testified he spent his day watching television and alternating between sitting, standing, and lying down (Tr. 40). He testified he had to use a cane to walk (Tr. 47), that he could walk ten feet before he had to sit down, and that he could stand for five minutes (Tr. 48). Plaintiff testified he had concentration and memory difficulties as well (Tr. 41). He stated that he took Attention Deficit Disorder ("ADD") and antidepressant medication (Tr. 41). Plaintiff said his wife did most of the household chores (Tr. 40, 193).

### 2.    Medical Evidence

In October and November 2005, Plaintiff sought care for vomiting with weight loss and was treated for Barrett's Esophagitis (Tr. 226-29). His work-up included an abdominal CT scan, which revealed spinal spondylosthesis and spondylosis at L5-S1 (Tr. 232). Between November 2005 and January 2006, Plaintiff's physician, Hampton Mansion, M.D., diagnosed osteoarthritis; Plaintiff complained of aching hands and back with cold water and redness, tenderness, pain and swelling in the "MTP" joints (Tr. 237-38). Dr. Mansion prescribed Suboxone (Tr. 237-38). On January 20, 2006, Dr. Mansion informed Plaintiff he could no longer prescribe Suboxone to him based upon evidence of Plaintiff's continued use of prescription and illicit substances (Tr. 236).

Beginning in February 2006, and continuing for almost two years, Plaintiff received care from Beech Daly Medical Center (Tr. 483-537; *see also* Tr. 308-12). Initially, Plaintiff complained of joint swelling and pain (Tr. 308). His reported medical history included gout, ADD, reflux, Barrett's Esophagitis, and rheumatoid arthritis (Tr. 308). On examination, Plaintiff had swelling in the third MCP joint of his right hand, and tenderness in the MTP joint of his right foot with a bunion and a hallux valgus deformity (Tr. 309). March 2006 radiology studies of Plaintiff's right hand showed erosion of the distal third metacarpal joint with possible spurring

-4-

and arthritis (Tr. 306).  Plaintiff's doctor prescribed medications for his pain (Tr. 309-11).  While some of the treatment notes from this time-period are illegible, it is clear that, while being treated at Beech Daly Medical Center, Plaintiff generally complained of foot, neck, and back pain and continued to receive prescription medications, including pain medications (Tr. 308, 485-537).

In May 2006, Plaintiff saw orthopedist Daniel Morrison, D.O., for evaluation of his hands (Tr. 275).  Dr. Morrison said Plaintiff had obvious advanced rheumatoid disease (Tr. 275).  He said Plaintiff had swelling about the metacarpophalangeal joints of both hands which made him quite debilitated in regards to function (Tr. 275).  Dr. Morrison said Plaintiff had limited grip strength, pain, and thick nodules about the MCP and also the PIPJ at the thumb base (Tr. 275).  Dr. Morrison said surgery was not indicated and recommended a rheumatology referral (Tr. 275).

Also in May 2006, podiatrist Alan Schram, D.P.M., evaluated Plaintiff, and noted that Plaintiff had clinical and radiographic evidence of a severe congenital metatarsus adductus deformity that had led to a prominent bunion of the big toe and rigid second toe with hammer syndrome (Tr. 283).  Dr. Schram said because the conditions were so severe, rigid, and showing degenerative joint changes, there was very little that could be done conservatively (Tr. 283).  He recommended anti-inflammatory medications for pain and inflammation and modified shoe gear (Tr. 283).  Dr. Schram noted surgery could remedy the conditions, but that Plaintiff would be in recovery for twelve weeks before returning to work (the first six weeks of which he would be non-weight bearing) (Tr. 283).

Between May and August 2006, Plaintiff received treatment from Howard Wright, D.O. (Tr. 345-419).  At his initial evaluation with Dr. Wright, Plaintiff complained of weight loss and

a history of rheumatoid arthritis, a bad back, and a bad neck (Tr. 357).  Plaintiff indicated he had

been taking Vicodin for ten years (up to twenty per day), but wanted to start Suboxone for pain

(Tr. 357).  Plaintiff also asked for referral to a psychiatrist (Tr. 357).  Dr. Wright said Plaintiff

appeared healthy and in no distress (Tr. 359).  He had a normal gait but had swollen and tender

hands with trigger fingers, and he had some swelling in his feet (Tr. 359).

In May 2006, a cervical spine X-ray revealed mild degenerative changes; X-rays of

Plaintiff's hands showed mild degenerative changes; and X-rays of his feet showed degenerative

changes, hallux valgus deformity of the great toe, and bilateral heel spurs (Tr. 356).  On mental

status examination, Plaintiff was oriented with appropriate judgement, normal memory,

appropriate mood and affect, no suicidal or homicidal ideations, and no apparent response to

internal stimuli (Tr. 360).  Dr. Wright said Plaintiff's rheumatoid arthritis and neck pain had

remained stable; his joint pain, back pain, and gout were unchanged; and his hypertension was

improved (Tr. 360).  Dr. Wright advised Plaintiff regarding his diet and advised him to engage in

regular, sustained exercise for at least thirty minutes three to four times per week (Tr. 362).  He

prescribed numerous medications, including Suboxone (Tr. 360-61).  Plaintiff returned one week

later complaining of pain, but stating that Suboxone helped (Tr. 366).  Dr. Wright continued to

refill Plaintiff's prescriptions, including Suboxone (Tr. 366-69, 372-73, 378-81, 385, 392, 400-

01, 410).

Later in May 2006, and in June 2006, Dr. Wright noted Plaintiff had tenderness about the

head and neck musculature (Tr. 374, 380), and prescribed Cymbalta for depression and

medication for ADD as well (Tr. 375).  Plaintiff continued to be oriented with appropriate mood

and affect, intact memory (except for impaired remote memory on one occasion in July), ability

to give personal history, and demonstrated understanding of activities, consequences, his needs, and social situations (Tr. 368, 375, 380, 394, 403, 418).  Dr. Wright said Plaintiff's depression and ADD improved with medication and were stable (Tr. 361, 381, 387, 403, 418).

Plaintiff was treated at the emergency room on June 3, 2006, after he injured his left hand with a power saw (Tr. 544-552).  An X-ray revealed fractures along the proximal phalanges of the index, middle, and ring fingers (Tr. 551).  Plaintiff underwent a repair of the extensor tendons of the index, middle, and ring fingers, open reduction and K-wire fixation and stabilizing of the fractures of the proximal phalanx of the index, middle, and ring fingers, and there was a laceration on the left ring finger, which was repaired (Tr. 549)

In June and July 2006, Plaintiff received follow-up treatment from hand surgeon Robert Barbosa, D.O., for the power saw injury to his left hand (Tr. 316-22, 414; *see also* Tr. 542-71). Plaintiff underwent surgical repair to the tendons of both fingers and bone graft of the middle finger (Tr. 316, 566-68).  X-rays after the surgery showed excellent position of the hardware and bone graft in the left middle finger (Tr. 316).  Plaintiff was to wear a cast for another two weeks (Tr. 316).  On follow-up in early August 2006, Dr. Barbosa noted Plaintiff was still on non-work status but would have wire removed in two weeks and then begin a more structured rehabilitation program (Tr. 414).

On July 24, 2006, Plaintiff underwent a consultative evaluation with Cynthia Shelby-Lane, M.D. (Tr. 331-41).  Dr. Shelby-Lane noted that Plaintiff walked with a slight right-sided limp, but had a normal stance (Tr. 335).  He was able to slowly tandem walk, heel walk, and toe walk (Tr. 335).  Plaintiff was able to squat and bend ninety percent of the distance and recover (Tr. 335).  Dr. Shelby-Lane reported that Plaintiff had a fair muscle tone without flaccidity,

spasticity, or paralysis (Tr. 336).  He could perform all postural ranges of motion, including sitting, standing, stooping, carrying, pushing, pulling, buttoning clothes, tying shoes, dressing and undressing, squatting, getting on and off the examination table, and climbing stairs (Tr. 339).  Plaintiff wore a hand immobilizer on his left hand and had no range of motion or grip strength on the left; he had full grip strength on the right (Tr. 335-36).  Dr. Shelby-Lane's impression was abdominal pain history with hernia repair, Barrett's Esophagitis, history of rheumatoid arthritis, history of chronic back pain, history of left hand injury, and history of depression (Tr. 336).

Also on July 24, 2006, Plaintiff underwent a consultative psychological evaluation with Nick Boneff, Ph.D. (Tr. 323-30).  Plaintiff complained of trouble sleeping and mood swings, but said he was generally cheery and denied any history of psychiatric hospitalization or any use of psychiatric medications (Tr. 325-26).  Plaintiff said he was in mental health treatment at the VA and had been diagnosed with post-traumatic stress disorder (PTSD), but he really thought he had bipolar disorder (Tr. 326).  Plaintiff described a history of alcohol and drug abuse, but denied any present use (Tr. 326).  Dr. Boneff observed that Plaintiff was in contact with reality, with no evidence of thought disorder (Tr. 327).  Plaintiff was hyperverbal, and he appeared to have possibly been exaggerating his symptoms (Tr. 327).  His moods were somewhat tangential and circumstantial (Tr. 327).  Plaintiff said he sometimes heard his name being called, and felt plotted against by people in general such as the doctor who examined him earlier (Tr. 327).  Plaintiff was oriented, able to repeat three digits forward, but not two backwards; he recalled only one of three objects after a three minute delay; and he knew the current president but not the past one (Tr. 328).  He was able to name five large cities, and he was able to perform serial seven calculations and simple addition and subtraction, but not multiplication or division (Tr. 328).  Dr.

-8-

Boneff diagnosed bipolar affective disorder, substance abuse disorders in remission, and mixed personality disorder with borderline and antisocial features (Tr. 329). He rated Plaintiff's Global Assessment of Functioning (GAF) as 47 (Tr. 329).[2]

In August 2006, state agency psychiatrist Thomas T.L. Tsai, M.D., reviewed the record and concluded Plaintiff had a severe mental impairment with mild limitations in daily activities; moderate limitations in social functioning and in maintaining concentration, persistence, or pace; and no episodes of decompensation (Tr. 425-39). Dr. Tsai opined Plaintiff was moderately limited in his abilities to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; accept instructions and respond appropriately to supervisory criticism; and respond appropriately to changes in the work setting (Tr. 421-23). Dr. Tsai opined Plaintiff was not significantly limited in the remaining fourteen of twenty work-related mental activities (Tr. 421-22). He summarized that, due to his bipolar disorder and history of substance abuse, Plaintiff was moderately impaired in his ability to maintain attention and concentration, accept instruction and respond appropriately to criticism, respond appropriately to changes in the work setting, and perform activities with persistence and pace (Tr. 423). Dr. Tsai concluded that Plaintiff could perform "unskilled work" (Tr. 423).

---

[2] The GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

Also in August 2006, state agency physician B.D. Choi, M.D., reviewed the record and opined Plaintiff could perform light work with frequent balancing and occasional climbing, stooping, kneeling, crouching, and crawling; and with frequent handling and fingering and no limits on reaching or feeling (Tr. 440-47). Dr. Choi also opined Plaintiff should avoid moderate exposure to extreme cold and heat and avoid concentrated exposure to hazards (Tr. 444).

In September 2006, and again in December 2006, a clinician at Beech Daly Medical Center noted Plaintiff had not seen a rheumatologist as recommended for his arthritis (Tr. 505). Plaintiff got refills through April 2007, when a clinician noted he needed to be seen (Tr. 503-04). In July 2007, Plaintiff asked for a letter from Beech Daly Medical Center physician, Vijaya Thandra, M.D., releasing him from the clinic so he could find a different primary physician; he also wanted medication refills (Tr. 501). However, Plaintiff continued at Beech Daly (Tr. 485-501). In August 2007, Plaintiff complained of foot, hand, and elbow pain from rheumatoid arthritis, and of neck pain for the past year that radiated down his right arm; he said he was unable to lift his arm above his shoulder; an MRI was planned (Tr. 500). In October 2007, Plaintiff's clinician diagnosed a hernia after he did some lifting (Tr. 497). In November 2007, Plaintiff had bilateral hand tenderness with prominent MCP joints (Tr. 496).

In January 2008, a cervical spine MRI revealed mild disc disease and mild hypertrophic change (Tr. 517-18). In an undated note referring Plaintiff to Pain Management for evaluation, Dr. Thandra said Plaintiff had a history of chronic neck pain and osteoarthritis of multiple joints, which had been maintained with Vicodin, and that he complained of hand numbness (Tr. 486). Dr. Thandra said Plaintiff reported having epidural injections over the past two years for neck pain (Tr. 486). He noted cervical spine MRI mainly showed osteoarthritis (Tr. 486).

-10-

On February 21, 2008, Dr. Thandra completed a form about Plaintiff's condition; he indicated that he had examined Plaintiff that day, and said he first saw Plaintiff in February 2006 (Tr. 489-90). Dr. Thandra opined Plaintiff could perform sedentary work, lifting and carrying up to ten pounds occasionally and less then ten pounds frequently; standing or walking at least two hours in an eight hour day; and sitting about six hours in an eight hour day (Tr. 490). Dr. Thandra said Plaintiff could perform no simple grasping, reaching, pushing/pulling, fine manipulation, or operation of foot or leg controls (Tr. 490). Dr. Thandra said the medical findings supporting these limitations consisted of arthritis with decreased range of motion in the hands (Tr. 490). Dr. Thandra said Plaintiff had limited ability to sustain concentration due to his ADD (Tr. 490). Dr. Thandra indicated that Plaintiff's condition was deteriorating, but that he could meet his needs in the home (Tr. 490).

### 3. Vocational Expert

At the administrative hearing, the ALJ asked a vocational expert, Lois Brooks, whether any jobs existed for an individual of Plaintiff's age, education, and work experience, if that individual could perform light work, but who could only frequently – as opposed to constantly – reach with both upper extremities, finger, handle, stoop, crouch, kneel, and crawl; who had to avoid ropes ladders, and scaffolds; and who could only perform simple, repetitive tasks that only entailed occasional contact with the public (Tr. 52). The vocational expert testified that such an individual could perform 4,000 inspector/sorter jobs and 12,400 office cleaning jobs in Southeastern Michigan (Tr. 52-53). The vocational expert indicated her testimony did not conflict with information in the *Dictionary of Occupational Titles* (Tr. 54).

### C.   Plaintiff's Claims of Error

Plaintiff argues that the ALJ's decision is not based upon substantial evidence and should not be affirmed, but rather remanded.  Plaintiff breaks his argument down into the following sub-categories: 1) that the ALJ failed to properly evaluate Plaintiff's mental impairments; 2) that the ALJ erred in rejecting the opinion of Plaintiff's treating physician (Dr. Thandra) and that the ALJ's RFC does not fully account for Plaintiff's impairments; 3) that the ALJ made an improper credibility finding that fails to comply with SSR 96-7p and 20 C.F.R. § 404.1529; and 4) that the ALJ failed to meet his burden at step five.

## III.   DISCUSSION

### A.   Standard of Review

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious.  *Sullivan v. Zebley*, 493 U.S. 521 (1990).  The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council.  *Bowen v. Yuckert*, 482 U.S. 137 (1987).  If relief is not found during this administrative review process, the claimant may file an action in federal district court.  *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact

unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more

than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx. 521, 526 (6th Cir. 2006).

### B.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc.*

-14-

*Sec.*, 74 Fed.Appx. 515, 524 (6th Cir. 2003).  There are several benefits programs under the Act,

including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq.*)

and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq.*).

Title II benefits are available to qualifying wage earners who become disabled prior to the

expiration of their insured status; Title XVI benefits are available to poverty stricken adults and

children who become disabled.  F. Bloch, Federal Disability Law and Practice § 1.1 (1984).

While the two programs have different eligibility requirements, "DIB and SSI are available only

for those who have a 'disability.'"  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).

"Disability" means:

> inability to engage in any substantial gainful activity by reason of
> any medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial
> gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or
> combination of impairments, that "significantly limits...physical or
> mental ability to do basic work activities," benefits are denied
> without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful
> activity, has a severe impairment that is expected to last for at least
> twelve months, and the severe impairment meets or equals one of
> the impairments listed in the regulations, the claimant is
> conclusively presumed to be disabled regardless of age, education
> or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."  *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540.  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors."  *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

### C.    *Analysis and Conclusions*

As discussed above, Plaintiff raises four general arguments in his motion for summary judgment: 1) that the ALJ failed to properly evaluate Plaintiff's mental impairments; 2) that the ALJ erred in rejecting the opinion of Plaintiff's treating physician (Dr. Thandra) and that the ALJ's RFC does not fully account for Plaintiff's impairments; 3) that the ALJ made an improper

credibility finding that fails to comply with SSR 96-7p and 20 C.F.R. § 404.1529; and 4) that the ALJ failed to meet his burden at step five.

### 1.    Plaintiff's Mental Impairments

Plaintiff first argues that the ALJ failed to properly evaluate his mental impairments.  *See* Pl.'s Br. at 11-13.  He argues that the ALJ should have given more weight to the opinion of the examining psychologist, Dr. Boneff, who rated Plaintiff's GAF as 47, which Plaintiff notes indicates serious symptoms or difficulty functioning.  *See* Pl.'s Br. at 11, citing *DSM-IV-TR*. The ALJ considered, but rejected, Dr. Boneff's GAF rating.  Defendant responds that the ALJ correctly found that Dr. Boneff's GAF rating was inconsistent with and not supported by his clinical findings (Tr. 20).  Defendant's argument is well-taken.  Indeed, in support of his argument, Plaintiff cites only his subjective reports from his visit with Dr. Boneff.  *See* Pl.'s Br. at 11-12, citing Tr. 325-29.  As discussed in greater detail below, the ALJ found that Plaintiff was not generally credible (Tr. 21-23).  The ALJ also noted that Plaintiff was likely exaggerating his subjective reports to Dr. Boneff; in fact, the ALJ noted that even Dr. Boneff himself recorded that he thought Plaintiff was exaggerating his symptoms (Tr. 20).  As such, it appears that substantial evidence supports the ALJ's evaluation of Plaintiff's mental impairments.

Even aside from the weight given to the particular GAF score, a GAF score may help an ALJ assess mental residual functional capacity, but it is not raw medical data.  *Kennedy v. Astrue*, 247 Fed. Appx. 761, 766 (6th Cir. 2007).  Furthermore, the Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"  *Id.*, quoting *DeBoard v. Comm'r of Soc. Sec.,* 211 Fed. Appx. 411 (6th Cir.

2006). Accordingly, the undersigned finds that the ALJ did not fail to properly evaluate Plaintiff's mental impairments.

### 2. Dr. Thandra's Opinion

Plaintiff next argues that the ALJ erred by rejecting the opinion of Dr. Thandra, who treated him for two years and who opined that he could perform only a restricted range of "sedentary" work, which is more restrictive than the "light" work that the ALJ found Plaintiff could perform. *See* Pl.'s Br. at 14-17, citing Tr. 489-90. Defendant responds that the ALJ reasonably rejected Dr. Thandra's opinion, explaining that the doctor's opinion was not supported by his treatment notes or the medical findings and signs (Tr. 23). Defendant's argument is well-taken. Indeed, Dr. Thandra did not provide sufficient medical findings in support of his opined limitations. Rather, when queried as to the medical findings that supported his opined limitations, Dr. Thandra essentially reiterated Plaintiff's diagnoses of arthritis; he stated Plaintiff had decreased range of motion, but did not explain how such a generic finding would support such severe limitations as lifting and carrying only at sedentary levels or no manipulative activities (Tr. 490). Dr. Thandra's opinion simply does not contain sufficient evidence to support the extreme limitations he opined.

Furthermore, as the ALJ noted, the medical findings did not support Dr. Thandra's extreme opinion but were more consistent with the opinion of the state agency physician Dr. Choi, who opined Plaintiff could perform a range of light work. The ALJ discussed that Dr. Choi's opinion was more consistent with the medical evidence of record than was Dr. Thandra's (Tr. 21-23). In terms of the referenced medical evidence, the ALJ reviewed Plaintiff's radiological studies (including his hands as well as his spine), which showed only mild disc

-18-

disease and mild changes (Tr. 21, 356, 517-18).  The ALJ discussed that Dr. Shelby-Lane's

findings on consultative evaluation, included Plaintiff's normal stance, fair muscle tone, and,

despite a slight limp, his ability to perform all walking and postural activities (Tr. 21, 335-36,

339).  He had full grip strength on the right, but could not be tested on the left due to his recent

surgery and use of a hand immobilizer (Tr. 336).  In sum, it is not apparent that the ALJ

improperly rejected the opinion of Dr. Thandra.  Rather, the ALJ's decision – the Plaintiff could

perform a limited range of "light" work – appears to be supported by substantial evidence.

### 3.    Plaintiff's Credibility

Plaintiff next argues that the ALJ made an inadequately articulated credibility finding.

*See* Pl.'s Br. at 17-19.  Defendant points out that the ALJ explained several times in his decision

that his findings were based on inconsistencies between Plaintiff's statements and the medical

records and argues that the ALJ reasonably found that, overall, these inconsistencies detracted

from Plaintiff's allegations of disabling limitations.  Plaintiff also challenges the ALJ's emphasis

on his receipt of essentially conservative treatment.  *See* Pl.'s Br. at 19.  Defendant responds to

this argument that the ALJ may reasonably consider if a claimant has received only conservative

treatment in evaluating his allegations of disabling limitations.  The record shows that the ALJ

did not find that Plaintiff was not disabled because he did not undergo surgery.  Rather, as the

evidence demonstrates, Plaintiff either chose not to undergo surgery, or was not considered a

surgical candidate (Tr. 275, 283).  Of note, when surgery was advised, Plaintiff indicated he was

not in a position to be out of work for twelve weeks (Tr. 283).  This type of evidence tends to

suggest that Plaintiff's allegations of pain and limitations are not as severe as alleged, and may be

considered by an ALJ in evaluating credibility.  *See* Social Security Ruling (SSR) 96-7p.

Plaintiff also takes issue with the ALJ's consideration of evidence that he demonstrated drug-seeking behavior. *See* Pl.'s Br. at 19. Defendant responds that the ALJ reasonably considered this as one among several factors which tended to detract from Plaintiff's credibility. The record evidence supports the ALJ's decision. For instance, Plaintiff's treating physician Dr. Mansion declined to prescribe a certain pain medication after he discovered evidence of Plaintiff's continued abuse of prescription and illicit substances (Tr. 236). The record shows that Plaintiff then went to a new doctor to get the medication (Tr. 357). Thus, the ALJ's finding that Plaintiff was not entirely credible – and that he could perform a limited range of light work – is supported by substantial evidence in the record. Plaintiff points to no evidence demonstrating error by the ALJ in evaluating his credibility.

Moreover, an ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). The undersigned finds that the ALJ adequately explained the reasoning behind his credibility findings and finds no basis to disturb the ALJ's findings.

### 4.    Remaining Arguments

Finally, Plaintiff raises an assortment of additional arguments at the end of his brief. None of these arguments provides a sufficient reason to disturb the findings of the ALJ. Specifically, Plaintiff challenges the ALJ's finding that he could perform a significant number of jobs other than his past work. *See* Pl.'s Br. at 20-22. In particular, Plaintiff argues that there are inconsistencies between the expert's testimony, upon which the ALJ relied, and the *DOT*. *See* Pl.'s Br. at 20. The expert, however, affirmed that there were not inconsistencies between her

testimony and the *DOT* (Tr. 54).  Nonetheless, Plaintiff speculates that the office cleaner job

cited by the vocational expert may actually correspond to the job of Housekeeping Cleaner,

which requires occasional public contact, or to the job of janitor job listed in the *DOT*, which is

medium or heavy work.  *See* Pl.'s Br. at 20-21.  However, even if the job of Housekeeping

Cleaner was the same job as cited by the vocational expert, Plaintiff's RFC allows for occasional

public contact (Tr. 20).  And, the vocational expert did not cite the job of janitor; she cited the

job of office cleaner, which she testified could be performed at the light level (Tr. 52-53).

Further, the vocational expert is not required to provide *DOT* numbers for the jobs she cites, as

Plaintiff suggests, *see* Pl.'s Br. at 21.  Rather, she is required to indicate if her testimony conflicts

with information in the *DOT*.  *See* SSR 00-4p.  Here, the vocational expert identified 4,000

inspector/sorter jobs which could be performed by Plaintiff (Tr. 52-53).  Plaintiff demonstrates

no error with the ALJ's reliance on the vocational expert's testimony.

 Finally, Plaintiff argues that the Medical-Vocational Rules would direct a finding of

disabled if he was limited to sedentary work.  *See* Pl.'s Br. at 22.  However, the ALJ found

Plaintiff was able to perform light work, as discussed above.  Likewise, Plaintiff's argument that

his fingering limitations would significantly erode the jobs available at the sedentary level is not

applicable since the ALJ found he could perform light work.

 In sum, after a review of the record, I conclude that the decision of the ALJ, which

ultimately became the final decision of the Commissioner, is within that "zone of choice within

which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d

at 1035, as the decision is supported by substantial evidence.

**III.     RECOMMENDATION**

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED** that Defendant's motion for summary judgment be **GRANTED** and that the findings of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.

S/Mark A. Randon _____
Mark A. Randon
United States Magistrate Judge

Dated:  January 15, 2010

## CERTIFICATE OF SERVICE

*I hereby certify that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 15, 2010.*

*S/Melody R. Miles*
*Case Manager to Magistrate Judge Mark A. Randon*
*(313) 234-5542*