UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS A. PEFLEY,

        Plaintiff,

                              Case No. 08-cv-15214
                              Paul D. Borman
v.                              United States District Judge

                              Mark A. Randon
                              United States Magistrate Judge

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

_____/

OPINION AND ORDER (1) ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION GRANTING THE COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT AND DENYING THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 21); (2) DENYING PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION (DKT. NO. 22); AND (3) DISMISSING THE ACTION

       Before the Court are Plaintiff Thomas A. Pefley's January 29, 2010 Objections (Dkt. No. 22) to Magistrate Judge Mark A. Randon's Report and Recommendation on Cross-Motions for Summary Judgment (Dkt. No. 21). The Commissioner filed a response to Plaintiff's Objections on February 12, 2010. (Dkt. No. 23.)

       The Court now reviews the Objections, Report and Recommendation, and pertinent parts of the record *de novo* pursuant to 28 U.S.C. § 636(b).

I.      **BACKGROUND**

1

## A.    Procedural History

Plaintiff has not objected to the facts as set forth in the Magistrate Judge's Report and Recommendation and portions of that Report and Recommendation are adopted here, and supplemented in part.  Plaintiff filed the instant claims on May 4, 2006, alleging that he became unable to work on October 1, 2005. (Tr. 135.) The claim was initially disapproved by the Commissioner on August 25, 2006. (Tr. 96.) Plaintiff requested a hearing and, on June 25, 2008, Plaintiff appeared with a non-attorney representative before Administrative Law Judge (ALJ) Dean C. Metry, who considered the case *de novo*. In a decision dated July 18, 2008, the ALJ found that Plaintiff was not disabled.  (Tr. 13.) Plaintiff requested a review of this decision on July 22, 2008. (Tr. 12.) The ALJ's decision became the final decision of the Commissioner when, after the review of additional exhibits[1] (AC-1, Tr. 11), the Appeals Council denied Plaintiff's request for review (Tr. 8); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004).

## B.    Facts

Plaintiff was born on May 14, 1968, and was 47 years old at the time he filed his claim and 50 years old on the date of the ALJ's decision.  (Tr. 13, 135.)  Plaintiff worked for 14 years as a construction laborer and pipe layer and last worked at this job in 2006.  (Tr. 36-37; 179-186.)  In his claim for disability benefits, Plaintiff claimed that the following illnesses, injuries, or conditions

---

[1] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

limited his ability to work: "Hernia in abdomen and throat problems and arthritis in hands and feet, severe joint pain and pain in back."

At the hearing before the ALJ, Plaintiff testified that hand, neck, and foot pain prevented him from working. (Tr. 37.) He stated that arthritis in his hands caused him difficulty closing his fingers to his palms. (Tr. 42-43.) Plaintiff also testified he had a great toe "hammertoe" deformity. (Tr. 44.) Plaintiff further testified he injured three fingers on his left hand on a saw. (Tr. 40, 42.) Plaintiff indicated to the ALJ that he was restricted in fully closing the fingers on his left hand. (Tr. 40.) On questioning from his attorney, Plaintiff testified that he had problems also with his right hand and that the inability to touch the palm of his hand with his fingers was more related to his arthritis. (Tr. 43.) Plaintiff stated that he prepared simple meals for himself (Tr. 193), but said his wife helped him dress. (Tr. 192.) He testified he spent his day watching television and alternating between sitting, standing, and lying down. (Tr. 40.) He testified he had to use a cane to walk (Tr. 47), that he could walk ten feet before he had to sit down, and that he could stand for five minutes. (Tr. 48.) Plaintiff testified he had concentration and memory difficulties as well. (Tr. 41.) He stated that he took Attention Deficit Disorder ("ADD") and antidepressant medication. (Tr. 41.) Plaintiff said his wife did most of the household chores. (Tr. 40, 193.)

Plaintiff began treating with Dr. Hampton Mansion, M.D. in July, 2005, for arthritis and gout. (Tr. 248-54.) In October and November 2005, Plaintiff sought care for vomiting with weight loss and was treated for Barrett's Esophagitis. (Tr. 226-29.) His work-up included an abdominal CT scan, which revealed spinal spondylolisthesis and spondylosis at L5-S1. (Tr. 232.) Between November 2005 and January 2006, Plaintiff's physician, Mansion, diagnosed osteoarthritis; Plaintiff complained of aching hands and back with cold water and redness, tenderness, pain and swelling

in the "MTP" joints. (Tr. 237-38.) Dr. Mansion prescribed Suboxone. (Tr. 237-38.) On January 20, 2006, Dr. Mansion informed Plaintiff he could no longer prescribe Suboxone to him based upon evidence of Plaintiff's continued use of prescription and illicit substances. (Tr. 236.)

Beginning in February 2006, and continuing for almost two years, Plaintiff received care from Beech Daly Medical Center. (Tr. 483-537; 308-12.) Initially, Plaintiff complained of joint swelling and pain. (Tr. 308.) His reported medical history included gout, ADD, reflux, Barrett's Esophagitis, and rheumatoid arthritis. (Tr. 308.) On examination, Plaintiff had swelling in the third MCP joint of his right hand, and tenderness in the MTP joint of his right foot with a bunion and a hallux valgus deformity. (Tr. 309.) March 2006 radiology studies of Plaintiff's right hand showed erosion of the distal third metacarpal joint with possible spurring and arthritis. (Tr. 306.) Plaintiff's doctor prescribed medications for his pain. (Tr. 309-11.)

Plaintiff was treated by orthopedist Daniel Morrison, D.O., in May, 2006 for evaluation of his hands. (Tr. 275.) Dr. Morrison said Plaintiff had obvious advanced rheumatoid disease. (Tr. 275.) He said Plaintiff had swelling about the metacarpophalangeal joints of both hands which made him quite debilitated in regards to function. (Tr. 275.) Dr. Morrison said Plaintiff had limited grip strength, pain, and thick nodules about the MCP and also the PIPJ at the thumb base. (Tr. 275). Dr. Morrison said he did not see Plaintiff as a surgical candidate and recommended a rheumatology referral. (Tr. 275.) A cervical spine x-ray performed on May 8, 2006, showed mild degenerative changes of the cervical spine. (Tr. 356.) Also on May 8, 2006, x-rays of Plaintiff's hands revealed mild degenerative changes and x-rays of Plaintiff's feet showed hallus valgus deformity of the big toe with degenerative changes and heel spurs. (Tr. 356.)

On May 18, 2006, podiatrist Alan Schram, D.P.M., evaluated Plaintiff on referral from Dr.

Wright, and noted that Plaintiff had clinical and radiographic evidence of a severe congenital metatarsus adductus deformity that had led to a prominent bunion of the big toe and rigid second toe with hammer syndrome. (Tr. 283.) Dr. Schram said because the conditions were so severe, rigid, and showing degenerative joint changes, there was very little that could be done conservatively and that pain would persist. (Tr. 283.) He recommended anti-inflammatory medications for pain and inflammation and modified shoe gear. (Tr. 283.) Dr. Schram noted surgery could remedy the conditions, but that Plaintiff would be in recovery for twelve weeks before returning to work (the first six weeks of which he would be non-weight bearing). (Tr. 283.)

Between May and August 2006, Plaintiff received treatment from Howard Wright, D.O. (Tr. 45-419). At his initial evaluation with Dr. Wright, Plaintiff complained of weight loss and history of rheumatoid arthritis, a bad back, and a bad neck. (Tr. 357.) Plaintiff indicated he had been taking Vicodin for ten years (up to twenty per day), but wanted to start Suboxone for pain. (Tr. 357.) Plaintiff also asked for referral to a psychiatrist. (Tr. 357.) Dr. Wright said Plaintiff appeared healthy and in no distress. (Tr. 359.) He had a normal gait but had swollen and tender hands with trigger fingers, and he had some swelling in his feet. (Tr. 359.) On mental status examination, Plaintiff was oriented with appropriate judgement, normal memory, appropriate mood and affect, no suicidal or homicidal ideations, and no apparent response to internal stimuli. (Tr. 360.) Dr. Wright said Plaintiff's rheumatoid arthritis and neck pain had remained stable; his joint pain, back pain, and gout were unchanged; and his hypertension was improved. (Tr. 360.) Dr. Wright advised Plaintiff regarding his diet and advised him to engage in regular, sustained exercise for at least thirty minutes three to four times per week. (Tr. 362.) He prescribed numerous medications, including Suboxone. (Tr. 360-61.) Plaintiff returned one week later complaining of pain, but stating that

Suboxone helped. (Tr. 366.) Dr. Wright continued to refill Plaintiff's prescriptions, including Suboxone. (Tr. 366-69, 372-73, 378-81, 385, 392, 400- 01, 410.)

Later in May 2006, and in June 2006, Dr. Wright noted Plaintiff had tenderness about the head and neck musculature (Tr. 374, 380), and prescribed Cymbalta for depression and medication for ADD as well. (Tr. 375.) Plaintiff continued to be oriented with appropriate mood and affect, intact memory (except for impaired remote memory on one occasion in July), ability to give personal history, and demonstrated understanding of activities, consequences, his needs, and social situations. (Tr. 368, 375, 380, 394, 403, 418.) Dr. Wright said Plaintiff's depression and ADD improved with medication and were stable. (Tr. 361, 381, 387, 403, 418.) Dr. Wright noted that Plaintiff's gait was intact and that his station and posture were normal. (Tr. 374.) Dr. Wright also noted that Plaintiff's cervical status had improved. (Tr. 376.)

Plaintiff was treated at the emergency room on June 3, 2006, after he injured his left hand with a power saw. (Tr. 544-552.) An X-ray revealed fractures along the proximal phalanges of the index, middle, and ring fingers. (Tr. 551.) Plaintiff underwent a repair of the extensor tendons of the index, middle, and ring fingers, open reduction and K-wire fixation and stabilizing of the fractures of the proximal phalanx of the index, middle, and ring fingers, and there was a laceration on the left ring finger, which was repaired. (Tr. 549.)

In June and July 2006, Plaintiff received follow-up treatment from hand surgeon Robert Barbosa, D.O., for the power saw injury to his left hand. (Tr. 316-22, 414; 542-71.) Plaintiff underwent surgical repair to the tendons of both fingers and bone graft of the middle finger. (Tr. 316, 566-68.) X-rays after the surgery showed excellent position of the hardware and bone graft in the left middle finger. (Tr. 316.) Plaintiff was to wear a cast for another two weeks. (Tr. 316.) On

follow-up in early August 2006, Dr. Barbosa noted Plaintiff was still on non-work status but would have wire removed in two weeks and then begin a more structured rehabilitation program. (Tr. 414.)

On June 17, 2006, Plaintiff was again seen by Dr. Wright who noted that Plaintiff's arthritis was worsening but that his gouty episodes had ceased and that his gait and posture again were normal. (Tr. 393-394.) Plaintiff saw Dr. Wright again on July 11, 2006, and Dr. Wright noted stable neck and low back pain and stable rheumatoid arthritis as well as normal gait and posture. (Tr. 402-403.).

On July 24, 2006, Plaintiff underwent a consultative evaluation with Cynthia Shelby-Lane, M.D. (Tr. 331-41). Dr. Shelby-Lane noted that Plaintiff walked with a slight right-sided limp, but had a normal stance. (Tr. 335.) He did not use a cane or aid for walking and was able to slowly tandem walk, heel walk, and toe walk. (Tr. 335.) Plaintiff was able to squat and bend ninety percent of the distance and recover. (Tr. 335.) Dr. Shelby-Lane reported that Plaintiff had a fair muscle tone without flaccidity, spasticity, or paralysis. (Tr. 336.) He could perform all postural ranges of motion, including sitting, standing, stooping, carrying, pushing, pulling, buttoning clothes, tying shoes, dressing and undressing, squatting, getting on and off the examination table, and climbing stairs. (Tr. 339.) Plaintiff wore a hand immobilizer on his left hand and had no range of motion or grip strength on the left; he had full grip strength (4/5) on the right. (Tr. 335-36.) Dr. Shelby-Lane's impression was abdominal pain history with hernia repair, Barrett's Esophagitis, history of rheumatoid arthritis, history of chronic back pain, history of left hand injury, and history of depression. (Tr. 336.)

Also on July 24, 2006, Plaintiff underwent a consultative psychological evaluation with Nick Boneff, Ph.D. (Tr. 323-30.) Plaintiff complained of trouble sleeping and mood swings, but said he

was generally cheery and denied any history of psychiatric hospitalization or any use of psychiatric medications. (Tr. 325-26.) Plaintiff said he was in mental health treatment at the VA and had been diagnosed with post-traumatic stress disorder (PTSD), but he really thought he had bipolar disorder. (Tr. 326.) Plaintiff described a history of alcohol and drug abuse, but denied any present use. (Tr. 326.) Dr. Boneff observed that Plaintiff was in contact with reality, with no evidence of thought disorder. (Tr. 327.) Plaintiff was hyperverbal, and he appeared to have possibly been exaggerating his symptoms. (Tr. 327.) His moods were somewhat tangential and circumstantial. (Tr. 327.) Plaintiff said he sometimes heard his name being called, and felt plotted against by people in general such as the doctor who examined him earlier. (Tr. 327.) Plaintiff was oriented, able to repeat three digits forward, but not two backwards; he recalled only one of three objects after a three minute delay; and he knew the current president but not the past one. (Tr. 328.) He was able to name five large cities, and he was able to perform serial seven calculations and simple addition and subtraction, but not multiplication or division. (Tr. 328.) Dr. Boneff diagnosed bipolar affective disorder, substance abuse disorders in remission, and mixed personality disorder with borderline and antisocial features. (Tr. 329.) He rated Plaintiff's Global Assessment of Functioning (GAF) as 47. (Tr. 329.)[2]

---

[2] The GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

In an August 17, 2006 Mental Residual Functional Capacity Assessment, state agency psychiatrist Thomas T.L. Tsai, M.D., reviewed the record and concluded Plaintiff had a severe mental impairment with mild limitations in daily activities; moderate limitations in social functioning and in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 425-39.) Dr. Tsai opined Plaintiff was moderately limited in his abilities to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; accept instructions and respond appropriately to supervisory criticism; and respond appropriately to changes in the work setting. (Tr. 421-23.) Dr. Tsai opined Plaintiff was not significantly limited in the remaining fourteen of twenty work-related mental activities. (Tr. 421- 22.) Dr. Tsai noted no episodes of decompensation. (Tr. 435.) He summarized that, due to his bipolar disorder and history of substance abuse, Plaintiff was moderately impaired in his ability to maintain attention and concentration, accept instruction and respond appropriately to criticism, respond appropriately to changes in the work setting, and perform activities with persistence and pace. (Tr. 423.) Dr. Tsai concluded that Plaintiff could perform "unskilled work." (Tr. 423.)

In an August 24, 2006 Physical Residual Functional Capacity Assessment, state agency physician B.D. Choi, M.D. reviewed the record and opined Plaintiff could perform light work with frequent balancing and occasional climbing, stooping, kneeling, crouching, and crawling; and with frequent handling and fingering and no limits on reaching or feeling. (Tr. 440-47.) Dr. Choi also opined Plaintiff should avoid moderate exposure to extreme cold and heat and avoid concentrated exposure to hazards. (Tr. 444.)

In September 2006, and again in December 2006, a clinician at Beech Daly Medical Center

noted Plaintiff was still experiencing pain in hands and feet but had not seen a rheumatologist as recommended for his arthritis. (Tr. 505.)

In July 2007, Plaintiff asked for a letter from Beech Daly Medical Center physician, Vijaya Thandra, M.D., releasing him from the clinic so he could find a different primary physician; he also wanted medication refills. (Tr. 501.) However, Plaintiff continued at Beech Daly. (Tr. 485- 501.) In August 2007, Plaintiff complained of foot, hand, and elbow pain from rheumatoid arthritis, and of neck pain for the past year that radiated down his right arm; he said he was unable to lift his arm above his shoulder; an MRI was planned. (Tr. 500.) In October 2007, Plaintiff's clinician diagnosed a hernia after he did some lifting. (Tr. 497.) In November 2007, Plaintiff had bilateral hand tenderness with prominent MCP joints. (Tr. 496.)

A January 9, 2008 cervical spine MRI revealed mild disc disease and mild hypertrophic change. (Tr. 517-18.) In an undated note referring Plaintiff to Pain Management for evaluation, Dr. Thandra said Plaintiff had a history of chronic neck pain and osteoarthritis of multiple joints, which had been maintained with Vicodin, and that he complained of hand numbness. (Tr. 486.) Dr. Thandra said Plaintiff reported having epidural injections over the past two years for neck pain. (Tr. 486.) He noted a cervical spine MRI that mainly showed osteoarthritis. (Tr. 486.) He did not specifically note any complaints about Plaintiff's feet.

On February 21, 2008, Dr. Thandra completed a Medical Examination Report and indicated that he had examined Plaintiff that day, and said he first saw Plaintiff in February 2006. (Tr. 489- 90.) Dr. Thandra opined Plaintiff could perform sedentary work, lifting and carrying up to ten pounds occasionally and less then ten pounds frequently; standing or walking at least two hours in an eight hour day; and sitting about six hours in an eight hour day. (Tr. 490.) Dr. Thandra said

Plaintiff could perform no simple grasping, reaching, pushing/pulling, fine manipulation, or operation of foot or leg controls. (Tr. 490.) Dr. Thandra said the medical findings supporting these limitations consisted of arthritis with decreased range of motion in the hands. (Tr. 490.) Dr. Thandra said Plaintiff had limited ability to sustain concentration due to his ADD. (Tr. 490.) Dr. Thandra indicated that Plaintiff's condition was deteriorating, but that he could meet his needs in the home. (Tr. 490.)

### C. The Vocational Expert's Testimony

At the administrative hearing, the ALJ asked a vocational expert, Lois Brooks, whether any jobs existed for an individual of Plaintiff's age, education, and work experience, if that individual could perform light work, but who could only frequently – as opposed to constantly – reach with both upper extremities, finger, handle, stoop, crouch, kneel, and crawl; who had to avoid ropes ladders, and scaffolds; and who could only perform simple, repetitive tasks that only entailed occasional contact with the public. (Tr. 52.) The vocational expert testified that such an individual could perform 4,000 inspector/sorter jobs and 12,400 cleaner jobs in Southeastern Michigan. (Tr. 52-53.) The vocational expert opined that if the person were limited to sedentary, as opposed to light work, and could only occasionally, as opposed to frequently, reach, finger, handle, stoop, crouch, kneel, and crawl, there would be no jobs in the relevant market. (Tr. 54.) The vocational expert indicated her testimony did not conflict with information in the *Dictionary of Occupational Titles.* (Tr. 54.)

## II.     ANALYSIS

### A.     Legal Standard

Where, as here, a magistrate judge has issued a report and recommendation and a party files timely objections to it, the district court conducts a *de novo* review of those parts of the report and

recommendation to which the party objects.  28 U.S.C. 636(b)(1).

This Court has jurisdiction to review the Commissioner's denial of Plaintiff's disability benefits.  *See* 42 U.S.C. § 405(g).   But in reviewing that decision, the Court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of  credibility. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).   Instead, judicial review of the Comissioner's decision is limited to an inquiry into whether his findings were supported by substantial evidence and whether he employed the proper legal standards in reaching his conclusion. *Brainard v. Sec'y of Health and Human Servs,*, 889 F.2d 679, 681 (6th Cir. 1989).  In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).   "Substantial evidence exists when a reasonable mind could accept the evidence as adequate to support the challenged conclusion, even if that evidence could support a decision the other way." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).   If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm:

> Under 42 U.S.C. § 405(g), the ALJ's findings are conclusive so long as they are supported by substantial evidence. [A court's] review is limited to determining whether there is substantial evidence in the record to support its findings. Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Further, [the court] must defer to an agency's decision even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ. [The court's] role is not to resolve conflicting evidence in the record or to examine the credibility of the claimant's testimony.

*Wright v. Massanari*, 321 F.3d 611, 614-15 (6th Cir. 2003) (internal citations and quotation omitted).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of

witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). "An ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir.2003). At the same time, the court may not make credibility determinations based solely upon "intangible or intuitive notions about an individual's credibility." *Rogers, supra* at 247, quoting Soc. Sec. Rul. 96-7p.

**B.      The ALJ's Determination**

The Commissioner evaluates disability claims using a five-step sequential process. 20 C.F.R. § 404.1520. Although the burden of proof is on the claimant through the first four steps of the process, if the fifth step is reached without a finding that the claimant is not disabled, then the burden shifts to the Commissioner. *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994). The five steps are as follows:

> 1. An individual who is working and engaging in substantial gainful activity is not disabled, regardless of the claimant's medical condition.
>
> 2. An individual who is working but does not have a "severe" impairment which significantly limits his physical or mental ability to do basic work activities is not disabled.
>
> 3. If an individual is not working and has a severe impairment which "meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s)", then he is disabled regardless of other factors.
>
> 4. If a decision cannot be reached based on current work activity and medical facts alone, and the claimant has a severe impairment, then the [Commissioner] reviews the claimant's residual functional capacity and the physical and mental demands of the claimant's previous work. If the claimant is able to continue to do this previous work, then he is not disabled.
>
> 5. If the claimant cannot do any work he did in the past because of a severe impairment, then the [Commissioner] considers his residual functional capacity, age, education, and past work experience to see if he can do other work. If he cannot, the

claimant is disabled.

*Id.* (citing 20 C.F.R. § 404.1520 (1982).

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since October 1, 2005. (Tr. 24.) At step two, the ALJ found that Plaintiff had the following "severe" impairments: osteoarthritis in both hands; rheumatoid arthritis; bi-polar disorder; and attention deficit disorder. (Tr. 18.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. 19.) Between steps three and four, the ALJ found that Plaintiff had the residual functional capacity (RFC) to "perform light work...except frequent reaching, fingering, handling, stooping, crouching, kneeling, and crawling; no ropes, ladders, scaffolds; simple, repetitive tasks; and occasional public contact." (Tr. 20.) At step four, the ALJ found that Plaintiff could not perform his previous work as a laborer, as this work required "heavy" exertion and was semi-skilled, which exceeded Plaintiff's RFC for no more than "light" work. (Tr. 23.) At step five, the ALJ denied Plaintiff benefits, as the ALJ found that Plaintiff could perform a significant number of jobs available in the national economy, such as: inspector/sorter (4,000 jobs in SE Michigan) and cleaner (12,000 jobs in SE Michigan). (Tr. at 23-24.)

## C.    Plaintiff's Objections

Plaintiff advances four objections to the Magistrate Judge's Report and Recommendation: (1) that the Magistrate Judge erred in concluding that substantial evidence supported the ALJ's assessment of Plaintiff's mental capacity; (2) that the Magistrate Judge erred in concluding that the ALJ properly weighed the medical evidence and in concluding that substantial evidence supported the ALJ's finding that Plaintiff was capable of "light work;" (3) that the Magistrate Judge erred in

upholding the ALJ's improper credibility determination; and (4) that the Magistrate Judge erred in relying on the vocational expert testimony of record.

As Defendant notes in his response to Plaintiff's Objections to the Magistrate Judge's Report and Recommendation, these Objections advance the same arguments that Plaintiff presented in his Motion for Summary Judgment, in significant portion verbatim. Thus, the Magistrate Judge directly addressed each of the arguments advanced by Plaintiff in his Objections.

### 1.       Plaintiff's Mental Capacity

Plaintiff claims that the Magistrate Judge erred in finding that the ALJ properly weighed the evidence regarding Plaintiff's GAF score of 47. First, the Court notes that the Commissioner "has declined to endorse the [Global Assessment Functioning] score for 'use in the Social Security and [Supplemental Security Income] disability programs,' and has indicated that [Global Assessment Functioning] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007) (quoting *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411 (6th Cir. 2006)). Accordingly, the Sixth Circuit has "affirmed denials of disability benefits where applicants had Global Assessment Functioning scores of 50 or lower." *DeBoard, supra* at 415 (citing *Smith v. Comm'r of Soc. Sec.*, No. 02-1653, 2003 WL 22025046, 74 F. App'x. 548 (6th Cir. Aug. 27, 2003) (Global Assessment Functioning score of 48)); *Nierzwick v. Comm'r of Soc. Sec.*, 7 F. App'x. 358 (6th Cir.2001) (Global Assessment Functioning score of 35).

Second, and more importantly, the ALJ noted that Dr. Boneff, who rendered the GAF score, qualified his opinion as to Plaintiff by observing that Plaintiff appeared to have been exaggerating his symptoms. Specifically, the ALJ noted: "The undersigned is not persuaded by the GAF score because it is inconsistent with Dr. Boneff's findings of the claimant's medical examination. His

findings do not show the claimant is significantly limited. In fact, Dr. Boneff believed there was a possibility of some exaggeration of symptoms." (Tr. 20; 325-329.)[3] The ALJ concluded after the hearing that Plaintiff was not credible in general. (*See infra* discussion at pp. 18-19.) Moreover, the Court notes that in his claim for disability benefits, Plaintiff did not indicate that mental illness was one of the limiting factors on his ability to work and in fact responded that he had never been seen by a doctor or any medical facility for emotional or mental problems that limit his ability to work. (Tr. 167-169.)

The ALJ's determination that Plaintiff could perform light work notwithstanding his claimed mental impairments was supported by substantial evidence. The Court denies Plaintiff's objection and finds that substantial evidence supports the Magistrate Judge's finding on Plaintiff's mental impairments.

2.      **The ALJ's Evaluation of the Medical Evidence**

Plaintiff argues that the Magistrate Judge erred in finding that substantial evidence supported the ALJ's rejection of Plaintiff's treating physician, Dr. Thandra. An ALJ is not bound by the conclusory statements of doctors, particularly where the statements are unsupported by detailed objective criteria and documentation. *Cohen v. Secretary of Health & Human Servs.*, 964 F.2d 524,

---

[3] Plaintiff claims that the ALJ had a duty to recontact Dr. Boneff, who gave Plaintiff the 47 GAF rating, rather than simply reject the finding outright. Plaintiff relies on SSR 96-5p, which discusses requirements for recontacting treating sources which provides: "Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion." First, it is not clear that Dr. Boneff would be considered a treating physician and second, the ALJ was able to ascertain from the record as a whole, and from Dr. Boneff's statement in his own assessment that Plaintiff possibly was exaggerating his symptoms, that the GAF score was not an accurate reflection of Plaintiff's limitations.

528 (6th Cir.1992). The ALJ determined that Dr. Thandra's opinion that Plaintiff could perform only sedentary work with no grasping, reaching, pushing, fine manipulating or operating of foot and leg controls and could stand for only 2 hours in an 8-hour workday was not supported by objective criteria. (Tr. 23.) When asked to detail the medical findings that supported these extreme physical limitations, Dr. Thandra responded simply: "Arthritis and limited range of motion in hands." Plaintiff has provided no other objective medical documentation to support this extreme limitation on his ability to perform light work. The radiological studies of Plaintiff's hands and spine showed only mild degenerative changes. (Tr. 356, 517-518.) The radiological studies of Plaintiff's feet showed valgus deformity of the big toe with degenerative changes. (Tr. 356.) But when Dr. Thandra referred Plaintiff for pain management sometime following these radiologic studies, Dr. Thandra made no mention of Plaintiff's pain in his feet, but only referred to Plaintiff's back and hands. (Tr. 486.) Moreover, Dr. Schram, the podiatrist who examined Plaintiff's feet, stated that surgery could remedy the situation, an option which Plaintiff did not pursue. (Tr. 283.) When Plaintiff saw Dr. Wright in May and August, 2006, Dr. Wright advised Plaintiff to engage in sustained exercise for at least thirty minutes three to four times a week as part of a regimen to relieve his joint pain. (Tr. 362.) The ALJ found that Plaintiff's treatment records did not reveal complaints of foot pain equivalent to Plaintiff's claimed impairment and found, nevertheless, that the RFC accommodated Plaintiff's possible limitations.

Although the medical evidence supported Plaintiff's contention that he suffered from rheumatoid arthritis, there is no evidence that Plaintiff ever sought consultation from a rheumatologist, as he was directed to do. (Tr. 505.) Also, the ALJ found it significant that Plaintiff testified that he could use his hands to play chess and cards. (Tr. 22, 195.) Although Plaintiff

hypothesizes in his Objections that: "Plaintiff may have a friend move his chess pieces based on his directions, or a board that holds his cards." (Pl.'s Obj. 6.) There is no evidence of this in the record; there is evidence of Plaintiff's dexterity in using his hands to play chess and card games.

The ALJ discussed the findings of Dr. Cynthia Shelby-Lane, MD, who found that Plaintiff, who was still in an immobilizer from his surgery on his left hand when she examined him, had grip strength of 4 out 5 on his right hand, did not use a cane or aid for walking, had a slight limp on the right side with normal stance and could tandem walk, heel walk and toe walk slowly. (Tr. 335-336.) Although admittedly Plaintiff was unable to be tested on his left hand due to his surgery, there is no indication that the surgery was intended to have permanent effects and in fact Plaintiff's surgeon, Dr. Barbosa, advised structured exercise for Plaintiff after removal of his cast. (Tr. 22, 414.)

The ALJ reasonably gave probative weight to the opinion of Dr. Choi, who opined that Plaintiff could frequently handle and finger and was occasionally limited in climbing, stooping, kneeling, crouching and crawling and could stand or sit about 6 hours in a workday. (Tr. 440-443.) Dr. Choi noted Plaintiff's deformed foot but found it "difficult to assess credibility" and found "minimal objective findings except for left hand injury, slight decreased grip right hand." (Tr. 445.)

The ALJ concluded that, although Plaintiff's medically determinable impairments could be expected to produce the symptoms he alleged, his statements concerning intensity and persistence were not credible and that Plaintiff could perform a limited range of "light work." (Tr. 21.) The Court finds no error in the ALJ's determination to give more weight to Dr. Choi's opinion than to Dr. Chandra's, where the latter's opinion was not supported by the documented medical evidence. Plaintiff's credibility, as discussed below, was called into question by many of the physicians who examined him and by the ALJ himself after the hearing. The Court finds that the ALJ did not

improperly discount the opinion of Dr. Thandra, which was not supported by the documented medical evidence. The ALJ's determination that Plaintiff could perform "light work" and could only frequently reach, finger, handle, stoop, crouch, kneel and crawl, and avoid ladders, ropes scaffolds, and perform only simple, repetitive tasks with only occasional public contact, was supported by substantial evidence.

### 3. The ALJ's Determination as to Plaintiff's Credibility

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citations omitted). This Court concludes that substantial evidence exists in the record to support the ALJ's adverse credibility finding.

As pointed out above, the ALJ several times in his opinion points to inconsistencies between Plaintiff's claimed limitations and the documented medical evidence. Indeed, Dr. Boneff and Dr. Choi both had reservations about Plaintiff's credibility. (Tr. 327, 445.) Dr. Boneff stated that Plaintiff appeared to possibly have exaggerated his symptoms and Dr. Choi found minimal objective findings to support Plaintiff's claimed impairments and found it difficult to assess Plaintiff's credibility. The ALJ confirmed these credibility "red flags" when he was able to observe Plaintiff's demeanor and question him directly about his claimed limitations.

Plaintiff alleges that the ALJ based his credibility determination on impermissible bases but in fact the ALJ recounted significant record evidence to support his conclusion. (Tr. 21-22.) In support of his conclusion that Plaintiff's claims of intensity and persistence were not supported by

the medical evidence, the ALJ relied on MRIs and x-rays which showed mild degenerative changes in Plaintiff's spine, the report of Dr. Shelby-Lane, Dr. Wright, and the Beech Daly Medical findings that support a finding of mild degenerative back problems. Although Plaintiff was diagnosed by Dr. Morrison with advanced rheumatoid arthritis, there is no evidence in the record that Plaintiff ever sought treatment from a rheumatologist as recommend by his examining physician. (Tr. 505.) And as to Plaintiff's foot pain, the record indicates that when Dr. Thandra referred Plaintiff for pain management following his 2008 radiologic studies, there was no mention of Plaintiff's foot pain. (Tr. 486.) As to Plaintiff's credibility on his claimed mental impairments, the ALJ found that the 47 GAF score was inconsistent with the remainder of Dr. Boneff's findings on Plaintiff's clinical exam and was further persuaded by Dr. Boneff's expressed reservations about Plaintiff's credibility.

Contrary to Plaintiff's assertion, the ALJ did not make an impermissible credibility determination based on "intangible or intuitive notions" about Plaintiff's credibility. The Court finds that the ALJ's determination regarding Plaintiff's credibility was supported by substantial evidence and was not based on serious errors.

### 4.       The Testimony of the Vocational Expert

Plaintiff's argument regarding the testimony of the vocational expert is in part premised on the fact that Plaintiff believes he should have been limited to sedentary, as opposed to light, work. However, as discussed above, the Court finds that the ALJ's decision that Plaintiff could perform light work was supported by substantial evidence and therefore, the hypothetical presented to the vocational expert, Ms. Brooks, was entirely appropriate. The ALJ asked Ms. Brooks if there would be any work for Plaintiff, given his background and education, if he could only perform light work, but could only frequently reach, finger, handle, stoop, couch, kneel and crawl but must avoid ropes,

ladders and scaffolds, with only occasional public contact. (Tr. 52.) Ms. Brooks replied that there were such jobs, described them, and testified specifically that her testimony was consistent with the DOT. This is what SSR 00-4p requires.

Plaintiff relies on *Teverbaugh v. Comm'r Soc. Sec.*, 258 F. Supp. 2d 702, 705 (E.D. Mich. 2003) to support his argument that the ALJ did not properly verify that the jobs identified by Ms. Brooks were consistent with the DOT. However, in *Teverbaugh*, the ALJ did not inquire at all of the vocational expert whether the jobs listed were consistent with the DOT: "It is undisputed that the ALJ failed to question the VE regarding whether the jobs she identified as being consistent with Plaintiff's residual functional capacity (RFC) conflicted with the DOT. The VE also failed to provide the codes for the positions that she listed, which would have enabled Plaintiff to consult the DOT to determine whether, in fact, a conflict exists." *Id*. at 705.

Plaintiff's attorney did not inquire of Ms. Brooks regarding the codes or jobs about which she testified. Plaintiff now states that none of the jobs suggested by Ms. Brooks are suitable to the ALJ's RFC. Plaintiff claims that the "office cleaner" position does not exist, but it is clear from the transcript of the hearing that the ALJ specifically inquired whether the cleaner job involved "housekeeping" and Ms. Brooks replied: "Offices, yes." Thus, while offices may have been included in her definition, so was housekeeping. And, as Plaintiff concedes, there is such a light-duty job at DOT 323.687-014. Also, the "inspector/sorter" position, identified at DOT 589.387-010, appears consistent with the hypothetical presented by the ALJ to Ms. Brooks. There is no evidence to contradict Ms. Brooks statement, when directly questioned by the ALJ, that her testimony was consistent with the DOT, other than Plaintiff's post-hoc listing of certain DOT codes which may or may not have been the jobs to which Ms. Brooks was referring.

Plaintiff has not provided evidence that the ALJ's reliance on the testimony of Ms. Brooks, who specifically testified that her recommendations were consistent with the DOT, was error. The Court finds that the final decision of the ALJ that Plaintiff could perform light work with occasional public contact, and that such jobs were available in the relevant market in significant numbers, was supported by substantial evidence.

## IV.    CONCLUSION

For these reasons, the Court:

(1)    ADOPTS the Magistrate Judge's Report and Recommendation Regarding Cross-Motions for Summary Judgment (Dkt. No. 21);

(2)    DENIES Plaintiff's Objections to the Magistrate Judge's Report and Recommendation (Dkt. No. 22);

(3)    DISMISSES the action WITH PREJUDICE.


IT IS SO ORDERED.


                                        S/Paul D. Borman
                                        PAUL D. BORMAN
                                        UNITED STATES DISTRICT JUDGE

Dated:  March 17, 2010

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on March 17, 2010.


                                        S/Denise Goodine
                                        Case Manager